**E-FILED**
Friday, 23 September, 2005  04:03:33 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

|  |  |  |
|---|---|---|
| LINDA NACHE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 04-4029 |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

### ORDER

This matter is now before the Court on Plaintiff's Motion for Summary Judgment [Doc. # 10] and Defendant's Motion to Affirm [Doc. # 13].  For the reasons set forth below, Plaintiff's Motion for Summary Judgment [Doc. # 10] is DENIED and Defendant's Motion to Affirm [Doc. # 13] is GRANTED.

### BACKGROUND

Nache, a 57-year old female, filed for Disability Insurance Benefits (DIB) in 2002 alleging a disability onset date of April 14, 2002 which she later amended to October 26, 2002.  (R. at 18, 26, 57.)  Nache alleged disability due to arthritis of the back and leg, scoliosis, degenerative joint disease, and low back pain.  (R. at 20.)

Prior to September 4, 2002, Nache was treated by Dr. Alex Pareigis for back pain and other ailments not relevant here.  (R. at 129-137.)  In April 2002, Nache reported that her back pain was worsening.  At that time, Dr. Pareigis ordered an MRI, physical therapy, and medication.  (R. at 135.)  The April 16, 2002 MRI showed mild narrowing in the disc spaces between some of Nache's

lumbar vertebrae, some degeneration in her lumbar vertebrae, and "mild central bulging" of two discs in the lumbar region. (R. at 138.) Between April 16, 2002 and April 20, 2002, Nache participated in physical therapy. (R. at 139-141.) A May 20, 2002 letter from the physical therapist indicated that Nache had reported "continued improvement in her symptoms with decreased frequency and intensity of symptoms," and that "her active range of motion was within normal limits and asymptomatic." The therapist also reported that Nache continued to complain of "occasional pain, but . . . [she was] very vague on the causative activities."

Between June 13, 2002 and November 14, 2002, Nache saw Dr. Anthony Kwan. (R. at 142-150.) On June 13, 2002, Dr. Kwan observed a "slight decreased reflex at the right heel and weakness of the right toe extensors which could indicate a possible L5-S1 radiculopathy,[1] although there was no evidence of this on the MRI study done in April." Dr. Kwan recommended Nache try using a "lumbosacral corset" when she was working, and he noted that he did not feel further physical therapy would be beneficial. (R. at 150.) On July 7, 2002, Dr. Kwan noted an exacerbation in Nache's low back pain and prescribed physical therapy and medication. On August 9, 2002, Dr. Kwan noted:

> At this point, the patient is fairly pain free from her history of mechanical low back pain. I am concerned that if she were to return back to per prior job, she would just re-exacerbate her chronic pain problems as she does have a level of general deconditioning and weakness in

---

[1]Defined as "any pathological condition of the nerve roots." See Merriam-Webster's Medical Dictionary (2002).

her abdominal and back extensor muscles. This was
evaluated thoroughly by the physical therapist. I
therefore recommend that she get into a post-physical
therapy programs (sic) where she works out on a daily
basis with the idea of strengthening her abdominal and
back muscles. . . . I will keep her off of work for
another three weeks but she is trying to pursue work in
a more sedentary sit-down desk job. . . .

(R. at 146.)

On October 26, 2002, Dr. Stanley Rabinowitz examined Nache at

the request of Disability Determination Services (DDS). Dr.

Rabinowitz observed the following:

Current physical examination revealed normal range of
motion testing throughout without evidence of active
joint inflammation or paravertebral muscle spasm.
Straight leg raising was negative at 90 degrees in the
sitting and supine positions. The patient had no
difficulty getting on and off the examining table but had
moderate difficulty squatting because of knee pain.
Neurological examination was within normal limits.

(R. at 163.)

On November 1, 2002, Dr. Kwan wrote a letter indicating Nache

would not be able to participate in jury duty because she was

"unable to sit still for a prolonged period of time." (R. at 143.)

On November 14, 2002, Dr. Kwan noted:

At this point, I feel that I have nothing else to offer
the patient acutely. She is following up with Dr.
Fullenkamp for repeat injection and medication issues.
I have encouraged the patient to return back to work,
and, if needed, a work evaluation, functional capacity
evaluation, and work hardening program can be started.
But, she has made up her mind that she is awaiting her
disability evaluation, which I doubt she will receive.
I also did mention that since physical therapy was not
helpful, she may want to try working with her
chiropractor. No further followup has been scheduled for
her. (R. at 142.)

Nache began seeing Dr. Jeffrey Fullenkamp in September 2002.

3

On December 31, 2002, Dr. Fullenkamp wrote:

> This is a very pleasant, 54-year-old white female whom we have done epidural and bilateral sacroiliac joint injections on in the past. She was last seen on 12/12/02. At that time, we did a lumbar epidural steroid injection. She said she got relief for a couple of weeks and then it just came back. The patient is looking to have me sign off on papers to give her social security disability. At this time, I do not feel that it is the appropriate thing to do. I have agreed to send her information in to the social security system but her MRI shows mild diffuse degenerative disk disease with some mild central bulging seen at L2-3 and at the L4-5 levels. No specific spinal stenosis is seen. The patient complains that when she does go to work that she has to do some heavy lifting and it hurts her back. I told [her] that she should talk with Eagle Foods and see if there is some other type of job that she can get. She does not look like she is in massive amounts of pain when she comes in to see us. I think she is only working 16 to 20 hours a week when she does work. It should be noted that she has not worked in over a month to a month-and-a-half, and she says she cannot live off the money she makes from Eagles working 16 hours a week being divorced. My feeling is that the patient is just trying to use the system to get money. I told her that I did not believe that she was completely disabled and that she should be able to work. I am going to send her to Dr. Robert Kaminski, D.C., an extremely good chiropractor to see if he can do something to help relieve her back pain. . . .

(R. at 151.)

In November 2002, state agency physician Dr. Robert England reviewed Nache's records and concluded that she could lift up to 50 pounds occasionally and 25 pounds frequently, that she could stand or walk for up to 6 hours in an 8-hour workday, that she could sit for up to 6 hours in an 8-hour workday, that she could push or pull without limitation, and that she could occasionally climb a ramp. (R. at 167-68.)

In February 2003, Dr. Peter Biale evaluated Nache for DDS.

4

(R. at 174.)  During the evaluation, Nache claimed her pain was in the "lumbosacral region" radiating "to the posterior part of both legs."  She indicated the pain was aggravated by bending, when she lifted more than 10 or 20 pounds, when she sat or stood for more than a few minutes, and when she walked or climbed.  She also reported pain in both knees when she walked or climbed.  (R. at 174.)  Dr. Biale observed that Nache was a "well-developed, well-nourished, cooperative person in no distress" and that when she "moved about, there was no apparent hesitation." (R. at 175.)  He noted that Nache had normal lumbar curvature, that she had no muscular spasms or tenderness in her back, that her range of motion was within normal limits for the "cervical and dorsal spine," that her range of motion in her "lumbosacral spine" was limited "with tenderness in the paraspinal muscles," and that her straight leg raise testing was "positive bilaterally at 60 degrees."  He further noted Nache had some difficulty squatting and doing the heel-to-toe walk. He observed that she had no difficulty getting on or off the exam table, that her gait was normal, and that her finger grasp and handgrip were unimpaired.  (R. at 176.)  Dr. Biale diagnosed Nache with low back pain that was gradually worsening, painful knees with full range of motion, and peptic ulcer disease.  (R. at 177.)

In March 2003, state agency physician Dr. Francis Vincent reviewed Nache's records and concluded that she could lift up to 50 pounds occasionally and 25 pounds frequently, that she could stand or walk for up to 6 hours in an 8-hour workday, that she could sit for up to 6 hours in an 8-hour workday, that she could push or pull

without limitation, and that she could occasionally climb a ramp or stairs, stoop, kneel, crouch, or crawl.  He noted, however, that she should avoid concentrated exposure to extreme cold.  (R. at 179-185.)

On May 1, 2003, Nache saw Dr. Collins for treatment of her back and leg pain.  Dr. Collins observed the following:

> A well-developed, well-nourished female in no apparent distress. . . . Gait and station is normal.  Her spine exam demonstrates decreased range of motion in about 25% planes.  The patient has a levoscoliosis that is obvious.  She is well balanced.  There is no instability of note.  She is nontender.  Her manual motor test is otherwise normal.  Sensation is normal.  Reflexes are symmetrical and equal.  Toes are down-going.  There is no clonus.  She has good distal pulses.  Hip, Knee, and ankle range of motions are all nontender and stable.  They are full.  The patients tension signs are negative.
> . . .
> At this point in time, I do not see anything on her MRI that would be causing the bilateral lower extremity issues.  She has not had any physical therapy or otherwise recently.  As a result, we are going to refer her to some physical therapy for a lumbar spine stabilization program.  She has had this in the past, however, not recently.  She has had treatment with a corset.  However, she has not been wearing this.  We will give her some Vioxx and let her try some of that and see if it does cause any stomach problems also.  She is to follow up with us in about eight weeks' time. . . . [A]s far as the bilateral lower extremity complaints go, they appear to be somewhat radicular in description; however, I do not see any neurocompressive event in the MRI.  She may have some foraminal issues as well as some lateral recess issues; however, I do not see anything severe.  So we will continue the work-up.  She may require selective nerve root blocks for evaluation versus an EMG.  At this point in time, we will try some conservative measures.

(R. at 197.)

As stated, Dr. Collins prescribed physical therapy for Nache for 2-3 times per week for 6 weeks.  (R. at 195.)  During the May 12, 2003 initial evaluation, the physical therapist reported:

> Patient presents . . . with complaints of chronic low back pain.  Patient currently presents with a low to moderate irritability and severity.  It is my assessment that patient would benefit from lower extremity strengthening as well as abdominal strengthening and patient education on proper body mechanics as well as postural importance.

(R. at 194.)  Nache attended a physical therapy session on May 15, however cancelled a May 21 appointment.  (R. at 192.)  At Nache's May 23 appointment the physical therapist noted the following:

> Patient is currently reporting pain with all motions. Patient states pain is increased with extension-biased activities, yet preferred lying in an extended position for heat.  Patient demonstrates pain with lumbar flexion in standing yet no pain whatsoever is reported in supine position with single knee-to-chest.  Patient states that exercises are aggravating to her but did not demonstrate any aggravation with exercises today in the clinic.

(R. at 191.)  Nache missed her May 27 appointment.  (R. at 191.) The physical therapist noted that Nache "tolerated treatment better" at her May 29 appointment, but Nache cancelled her next three appointments.  (R. at 190.)  On June 17, the physical therapist noted:

> It is my assessment that patient is not performing exercises at home.  When patient does perform exercises, I feel that they are only occasional.  Patient appears to be very deconditioned and is unable to tolerate approximately 10 to 15 minutes worth of strengthening activities to the abdominals and stretching activities. I do however feel that the patient would be a great candidate for aquatic therapy.  This plan was discussed with the patient who did demonstrate interest.
> . . . .
> Plan will be to follow-up with patient in approximately one to two weeks to determine if exercises have helped to decrease back pain.  Patient will not be seen in physical therapy secondary to her reports of pain increase every time she leaves therapy.

(R. at 187.)

Nache saw Dr. Collins again on June 11, 2003, at which time he noted:

> The patient states she is interested in applying for SSI because of all of her symptomatology. I have explained that I do not do disability. She would probably need an independent medical exam for that. I will provide her with some work restrictions at this point in time. She is to follow up with us in six weeks time after obtaining some more physical therapy for her cervical spine, shoulders and lumbar spine. She is also going to continue on Vioxx. She is going to place the corset on that she had previously and see how that does. At this point in time she verbalized understanding.

(R. at 196.)

In August 2003, Nache underwent a nerve conduction study. The doctor evaluating the study noted:

> There is eletrophysiological evidence of absent sural responses bilaterally, this may indicate an early peripheral neuropathy or bilateral SI radiculopathy, however the patient was quite nervous and could not relax possible resulting in a technical error, clinical correlation is recommended.

(R. at 200.)

In November 2003, Nache reported right knee pain and x-rays indicated some osteoarthritic changes. In December 2003, Dr. Michael Gerdes examined Nache for her knee pain. He noted that Nache had "obtained x-rays which revealed some patellofemoral arthritis" and that she "was treated expectantly and basically had resolution of her discomfort, having minimal trouble at the present time." (R. at 201-04.)

At the January 7, 2004, administrative hearing, Nache (who was represented by counsel) testified to the following. Her last employment was in a bakery at an Eagles grocery store. In that position she lifted packages up to 40 or 50 pounds and she stood on

8

her feet for six to eight hours per day.  (R. at 242.)  She stopped working at Eagles because of her back and leg pain.  (R. at 244.) Nache reported pain in her neck, and pain in her lower back that radiated into her legs with her right leg being more affected than her left.  She indicated that the shooting pain occurred about once a week and that the back pain occurred every day.  (R. at 246-47.) Nache testified she could lift between 10 to 20 pounds, that she could stand for about 20 minutes, and that she experienced pain after walking about a block.  (R. at 249-250.)  She stated that she drove around town and that she did her own housework although she cleaned less than she would like.  (R. at 252-253.)

During the administrative hearing, vocational expert Jeff Johnson testified about the availability of jobs for an individual Nache's age, with her education and work experience, and a residual functional capacity for work that required lifting/carrying up to 50 pounds occasionally and 25 pounds frequently, sitting and standing for up to two hours each for at least six hours in an eight-hour day, walking up to two blocks, only occasional climbing of ramps or stairs, only occasional stooping, kneeling, crouching, or crawling, with the additional restriction that the person not be exposed to extreme cold.  (R. at 258-59.)  Johnson testified that such a hypothetical individual could perform Nache's past relevant work as a kitchen helper and that the individual could also perform a significant number of unskilled "medium, light, sedentary" work jobs in the economy.  (R. at 259.)  Johnson also testified that if the restrictions were changed to lifting 20 pounds occasionally and

10 pounds frequently, sitting for up to an hour at a time for at least 6 hours of an 8 hour day, standing 20 to 30 minutes at a time, and walking up to one block, the individual would not be able to perform Nache's past relevant work and would not be able to perform work at a medium level. (R. at 259-260.)

The administrative law judge (ALJ) found that Nache's "degenerative joint disease of the lumbar spine and sacroiliac joint arthropathy and levoscoliosis, arthritis of the knees, and cervical osteoarthritis" were severe impairments. However, the ALJ found that Nache did not have an impairment or combination of impairments listed in or medically equal to the impairments listed in the regulations. The ALJ found Nache's allegations concerning the existence, persistence, and intensity of symptoms and limitations were not fully credible. He concluded that Nache had the residual functional capacity to lift up to 50 pounds occasionally and 25 pounds frequently, sit and stand for up to two hours each for at least six hours in an eight-hour day, walk up to two blocks, occasionally climb ramps or stairs, occasionally stoop, kneel, crouch, or crawl, with the restriction that she not be exposed to extreme cold. The ALJ concluded that these restrictions did not prevent Nache from performing her past relevant work and that jobs existed in significant numbers in the national economy that Nache could perform. Accordingly, the ALJ found Nache was not disabled and not entitled to benefits. (R. at 25-26.)

Nache appealed the ALJ's decision and the Appeals Council denied her request for review. (R. at 5-7, 8-14.) Thereafter,

10

Nache filed this civil action for review of the decision denying her benefits.  Nache has moved for summary judgment and the Commissioner has moved for summary affirmance.

## LEGAL STANDARD

In order to be entitled to DIB benefits, a plaintiff must show that his or her inability to work is medical in nature and that he or she is totally disabled.  <u>See</u> 20 C.F.R. § 404.1505.  Economic conditions, personal factors, financial considerations, and attitudes of employers are irrelevant in determining whether a plaintiff is eligible for disability benefits.  <u>See</u> 20 C.F.R. § 404.1566.

The establishment of disability under the Act is a two-step process.  First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months.  <u>See</u> 42 U.S.C. § 1382c (a)(3)(A).  Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment.  <u>See</u> <u>McNeil v. Califano</u>, 614 F.2d 142, 143 (7th Cir. 1980).  That factual determination is made by using a five-step test.  <u>See</u> 20 C.F.R. §§ 404.1520.

The five-step test is examined by the ALJ, in order, as follows:  (1) is the plaintiff presently unemployed; (2) is the

plaintiff's impairment "severe" (20 C.F.R. § 404.1521,); (3) does the impairment meet or exceed one of the list of specified impairments (20 C.F.R. Pt. 404, Subpt. P, App. 1); (4) is the plaintiff unable to perform his or her former occupation; and (5) is the plaintiff unable to perform any other work within the national economy?

An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled.  A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled.  See Garfield v. Schweiker, 732 F.2d 605, 607 n.2 (7th Cir. 1984).

The plaintiff has the burdens of production and persuasion on steps 1 through 4.  However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment.  See Tom v. Heckler, 779 F.2d 1250, 1253 (7th Cir. 1985); Halvorsen v. Heckler, 743 F.2d 1221, 1225 (7th Cir. 1984).

The Court's function on review is not to try the case *de novo* or to supplant the ALJ's finding with the Court's own assessment of the evidence.  See Pugh v. Bowen, 870 F.2d 1271, 1274 (7th Cir. 1989).  The Court must only determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied.  See Delgado v. Bowen, 782 F.2d 79, 82 (7th

Cir. 1986).   In determining whether the ALJ's findings are supported by substantial evidence, the Court must consider whether the record, as a whole, contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971).   Credibility determinations made by the ALJ will not be disturbed unless the finding is clearly erroneous.   See Imani v. Heckler, 797 F.2d 508, 510 (7th Cir.), cert. denied, 479 U.S. 988 (1986).

## ANALYSIS

The Court finds the ALJ's decision is supported by substantial evidence.   The medical evidence in the record supports the ALJ's finding that Nache's impairments are not disabling and that Nache's allegations concerning her pain and limitations are not fully credible.   Nache's own treating physicians have repeatedly indicated that the medical evidence did not support limitations that would prevent her from working.  For example, in November 2002 Dr. Kwan encouraged Nache to return to work.  In December 2002, Dr. Fullenkamp noted that his clinical findings showed only mild abnormalities and that Nache did not look like she was in "massive amounts of pain" when she saw him.  When Dr. Biale examined Nache in February 2003, he noted limited range of motion in Nache's "lumbosacral spine . . . with tenderness in the paraspinal muscles," however, he also observed that Nache had no difficulty getting on or off the exam table, that her gait was normal, and

that her finger grasp and handgrip were unimpaired.  In May 2003,
Dr. Collins also noted Nache had decreased range of motion in her
back, but he saw nothing in Nache's MRI that would be causing the
problem and recommended physical therapy and "conservative"
treatment measures.  See Powers v. Apfel, 207 F.3d 431, 435-36 (7th
Cir. 2000) (agency's decision to deny benefits affirmed where
medical evidence did not support extent of pain to which claimant
complained).

Also telling is the physical therapy notes from May and June
2003, in which the therapist noted that Nache's complaints were
inconsistent with her activities.  For example, on May 23 the
therapist noted:

> Patient is currently reporting pain with all motions.
> Patient states pain is increased with extension-biased
> activities, yet preferred lying in an extended position
> for heat.  Patient demonstrates pain with lumbar flexion
> in standing yet no pain whatsoever is reported in supine
> position with single knee-to-chest.  Patient states that
> exercises are aggravating to her but did not demonstrate
> any aggravation with exercises today in the clinic.

(R. at 191.)  And although Nache testified during the
administrative hearing that she performed exercises at home, the
physical therapist reported that Nache was deconditioned and likely
not doing so.  (R. at 187.)

Nache argues the ALJ misconstrued the opinions of Dr. Kwan and
Dr. Fullenkamp.  Specifically, Plaintiff points to Dr. Kwan's
statement on August 9, 2002, that Nache's condition might be
worsened if she returned back to her previous job.  Dr. Kwan,

14

noted, however, that this was because of "a level of general
deconditioning and weakness in [Nache's] abdominal and back
extensor muscles," that could be remedied with exercise, and he
later (in November 2002) encouraged Nache to return to work. Nache
also points to Dr. Fullenkamp's suggestion that she request
accommodations from her employer to allow her to return to work.
However, this suggestion was made in response to Nache's complaint
that her back pain would worsen if she returned to her previous
job, and the remainder of Dr. Fullenkamp's notes suggest he did not
believe the clinical findings supported the limitations Nache
reported to him.

Finally, Nache argues the ALJ failed to develop the record by
requesting additional records from Dr. Collins. While it is true
that an ALJ has a duty to develop a full and fair record, the
burden remains with the social security claimant to prove
disability. Smith v. Apfel, 231 F.3d 433, 437 (7th Cir. 2000). In
this case, although Dr. Collins stated he would continue his "work-
up," he noted that he did not "see anything severe," and there is
nothing in the record to suggest that Dr. Collins believed further
testing would reveal anything more severe. Cf. 20 C.F.R.
§ 404.1512(e)(1) (additional evidence or clarification from
medical source will be obtained where evidence received from
treating physician is inadequate to determine whether claimant is
disabled). Furthermore, Nache was given an opportunity to present

15

additional records from Dr. Collins but she did not.  <u>See</u> 20 C.F.R. § 404.1512(a) ("In general, you have to prove to us that you are blind or disabled. Therefore, you must bring to our attention everything that shows that you are blind or disabled. This means that you must furnish medical and other evidence that we can use to reach conclusions about your medical impairment(s) and, if material to the determination of whether you are blind or disabled, its effect on your ability to work on a sustained basis.")  Therefore, the Court finds the ALJ was under no obligation to develop the record further.

<u>**CONCLUSION**</u>

IT IS THEREFORE ORDERED that Plaintiff's Motion for Summary Judgment [Doc. # 10] is DENIED.

IT IS FURTHER ORDERED that Defendant's Motion to Affirm [Doc. # 13] is GRANTED.

CASE TERMINATED.


Entered this   <u>23rd</u>   day of September, 2005.


                    <u>s/ Joe B. McDade</u>
                    JOE BILLY McDADE
              United States District Judge

16